# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-059V
(not to be published)

* * * * * * * * * * * * * * * * * * * * * * * *
```
                                    *
L.J.,                               *
                                    *
             Petitioner,            *      Filed: January 20, 2023
                                    *
v.                                  *
                                    *
SECRETARY OF HEALTH                 *
AND HUMAN SERVICES,                 *
                                    *
             Respondent.            *
                                    *
```
* * * * * * * * * * * * * * * * * * * * * * * *

*Ronald C. Homer*, Conway, Homer, P.C., Boston, MA, Petitioner.

*Voris E. Johnson*, U.S. Dep't of Justice, Washington, DC, Respondent.

## DECISION AWARDING DAMAGES[1]

On January 13, 2017, L.J. filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] The Petition alleged that L.J. suffered from a Shoulder Injury Related to Vaccine Administration ("SIRVA") as a result of receiving the influenza ("flu") vaccine on October 20, 2014. Petition (ECF No. 1) at 1. The parties were unable to settle damages after I granted entitlement to Petitioner on December 2, 2021. *See* Ruling, dated December 2, 2021 (ECF No. 84). Accordingly, they have now briefed their respective positions.

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$92,658.75**, **representing $80,000.00 for past pain and suffering/emotional distress, $6,977.25 for past unreimbursed expenses, and $5,681.50 for past lost wages.**

### I.   Procedural History

This case was initiated on January 13, 2017. Pet. at 1. Respondent filed a Rule 4(c) Report on June 27, 2018, asserting that compensation was not appropriate in this case. ECF No. 44. On January 29, 2021, Petitioner filed her motion for a Ruling on the Record and on December 2, 2021, I issued a Ruling on Entitlement. ECF No. 84. The parties were unable to informally resolve the issue of damages, leading Petitioner to file a brief on damages on June 30, 2022. ECF No. 100 ("Mot."). Respondent filed his opposition brief to the motion on August 18, 2022. ECF No. 101 ("Opp."). Subsequently, Petitioner filed her reply on August 30, 2022. ECF No. 201 ("Reply"). The matter is now ripe for a resolution.

### II.   Factual Background[3]

*Relevant Pre-Vaccination Events*

L.J. was 41 years old at the time of the relevant vaccination. She was generally healthy, worked as a physical therapist, and was an avid exerciser, working out daily. Ex. 30 at ¶1. She had three children and a history of gestational diabetes. Ex. 4 at 2; Ex. 30 at ¶1. In or around January 2014, she was fitted with a custom nightguard for chronic clenching and grinding her teeth. Ex. 14 at 2. On October 3, 2014, a little over two weeks prior to vaccination, she presented to her doctor with a small mass on her left forearm, thought to be a cyst. Ex. 4 at 19. L.J. had no history of shoulder pain, inflammation, or dysfunction.

*Vaccination, Symptoms, and Fall 2014 Treatment*

On October 20, 2014, Petitioner presented to her employer's medical provider, Novant Health, and received the flu vaccine in her right deltoid. Ex. 1 at 1. L.J. returned to employee health nine days later, on October 29, 2014, complaining of right shoulder and arm pain, with numbness and change in sensation in her right hand. Ex. 5 at 8. She visited again on November 5, 2014, with continued complaints of right-hand numbness and tingling since her flu shot. Ex. 5 at 9. She was prescribed a Medrol Dosepak, referred to physical therapy, and referred to her primary care provider ("PCP") if her symptoms did not improve. *Id*. L.J. did not immediately start the medication.

---

[3] In the interest of efficiency, this summary is taken from relevant portions of the Ruling on Entitlement. ECF No. 95 at 2–6.

2

On November 7, 2014, L.J. presented to her PCP, Dr. Jamalla David, with complaints of right arm pain and nausea. Ex. 4 at 29. Petitioner saw Dr. David again five days later, on November 12, 2014, with continuing nausea, and expressed significant concern about her right arm pain. *Id*. at 33. Dr. David "strongly suspected uncontrolled anxiety as a factor in some of her sxs" and prescribed Klonopin but did not substantively assess L.J.'s right arm pain because she had an appointment with an orthopedist the same day. *Id*. at 41. Petitioner saw her gynecologist, Dr. Deena Castillion on November 17, 2014, with similar complaints along with fatigue, loose stools, and lack of appetite. Ex. 2 at 40. Dr. Castellion did not believe Petitioner's symptoms were anxiety, but a reaction to her recent vaccination. *Id*. at 41.

On November 21, 2014, L.J. presented to Dr. Meredith Snapp at Novant Health Neurology Specialists. Ex. 7 at 6. Dr. Snapp found reduced strength in Petitioner's right triceps, decreased sensation to light touch, temperature and vibration in Petitioner's neck, and decreased sensation in Petitioner's right lateral forearm. *Id*. at 7–8. She diagnosed "neuropathic pain in right arm after onset of flu shot," adding that the proximal progression of symptoms could be "secondary muscle tension," but disputing that the GI symptoms were likely related. *Id*. at 8. Dr. Snapp ordered MRIs of L.J.'s brain and cervical spine,[4] EMG and nerve conduction studies, and prescribed Gabapentin. *Id*. The EMG revealed abnormalities suggesting carpal and cubital tunnel syndromes. Ex. 28 at 7.

On December 2, 2014, L.J. sought the opinion of another orthopedist, Dr. Eric Warren. Ex. 10 at 2. Dr. Warren found full cervical strength and range of motion. *Id*. On Petitioner's right shoulder, he found a small "soft tissue mass," but full range of motion, full strength without pain, and negative impingement tests. *Id*. Dr. Warren reviewed L.J.'s brain and cervical spine MRI reports, and her recent lab reports. *Id*. at 4. He concluded that L.J.'s was a "complicated, concerning clinical picture overall though this may just be a subacromial/subdeltoid bursitis with a fibrotic scar tissue mass potentially related to her injection." *Id*. He opined that "it is certainly very possible she has a compensatory cubital tunnel syndrome or a previously undiagnosed ulnar nerve subluxation issue that is resulting in her symptoms." *Id*.

L.J. returned to Dr. Warren on December 11, 2014, to review the MRI and the abnormal nerve study results. Ex. 10 at 6. Dr. Warren felt that the "overall clinical picture was consistent with likely cascade effect with likely post-inflammatory reaction from flu vaccine which led to less use of shoulder leading to weakness and therefore change in biomechanics with resulting impingement." *Id*. at 7. He felt the EMG and nerve conduction studies revealed "almost certainly pre-existing conditions." *Id*.

---

[4] L.J. underwent cervical spine and brain MRIs on November 25. 2014. Ex. 28 at 4–5. The cervical spine MRI revealed normal cervical spine, but a "large left paracentral disc protrusion at T3-4 with corm compression. *Id*. at 5. The brain MRI revealed a possible small pituitary cyst and "small air fluid level in the right maxillary sinus." *Id*. at 4. The thoracic disc issue was later determined to be stable and did not require further treatment. Ex. 12 at 12–13.

*Treatment in 2015*

On January 1, 2015, L.J. presented to the emergency room complaining of "parethesias in her right arm that have now progressed to her right neck and right face," as well as nausea and loose stools, but was discharged. Ex. 13 at 9–11. The next day, L.J. presented to Dr. Faye Sherwood Campbell at her PCP complaining of "burning pain down the entire arm, right side of neck, right occipital area and now the right side of her face." Ex. 15 at 6. She also reported feeling "very anxious and nervous, shaky" and nauseous, with blurred vision. *Id*. Dr. Sherwood Campbell suggested that Petitioner cease all medications and follow up with neurology. *Id*. at 7. Dr. Sherwood Campbell saw Petitioner again on January 14, 2015, for numerous complaints including her right arm pain and numbness, and nausea, headache, sore throat, congestion, and cough. *Id*. at 17. Dr. Sherwood Campbell "suspected some of the symptoms of parethesias may be related to anxiety, which she clearly has. She is also exhibiting symptoms of depression." *Id*. at 18. She prescribed Cymbalta. *Id*.

On January 5, 2015, Petitioner presented to the Charlotte Headache Center with complaints of "moderate throbbing and burning headaches of right temporal, occipital, and frontal areas . . . for the last two to three months with pain of the side and back of the neck, pain in and behind the eyes." Ex. 14 at 2. Petitioner placed her symptoms onset after her flu shot in October, with "arm pain then radiated to neck, head, face." *Id*. The records note that Petitioner was "aware of chronic clenching and grinding" of her teeth, with TMJ symptoms appears 2-3 years prior, and that she had a custom night guard "made about a year ago" which she "uses nightly past 2 months." *Id*. A bilateral MRI of the temporomandibular joint ("TMJ") was ordered and performed on January 6, 2015, which showed abnormalities. *Id*.; Ex. 28 at 11. L.J. underwent a Trudenta treatment plan for her TMJ pain, having 14 treatments between January 13, 2015, and May 5, 2015. *Id*. at 3–7. At her one month follow up appointment, on June 2, 2015, Petitioner reported a 75% improvement in her symptoms and no continued therapy was recommended. *Id*. at 7.

On January 23, 2015, Petitioner returned to Ortho Carolina, seeing Dr. Erika Gantt. Ex. 8 at 10. Dr. Gantt noted that L.J.'s nerve tests showed "mild carpal tunnel syndrome and mild ulnar neuropathy," and that "most of her pain is on the lateral side of the elbow." *Id*. She diagnosed right lateral epicondylitis and recommended a brace, but did not opine that Petitioner's symptoms had "anything to do with her getting a flu shot in the arm," and adding that Petitioner seemed "somewhat frustrated that she cannot make the connection between the flu shot." *Id*.

L.J. presented to Dr. Ki Jung, a neurologist, on March 17, 2015, for pain in her right upper extremity, as well as her right posterior scalp and face. Ex. 20 at 5. Dr. Jung noted that L.J. had "high anxiety about her symptoms." *Id*. Dr. Jung "suspected that she indeed has a post-vaccination inflammatory syndrome that may have been exacerbated already pre-existing underlying right cubital tunnel syndrome and TMJ issues. I do not think she has any underlying sinister neurological

4

disorder at this time." *Id*. at 7. Dr. Jung recommended that L.J. follow up with psychiatry and that she avoid future flu vaccinations. *Id*.

Petitioner returned to OrthoCaroline on June 12, 2015, after her TMJ treatment ended. On that date, she saw Dr. Raymond Gaston, who noted that Petitioner's pain had persisted with bracing and a home exercise program. Ex. 8 at 7. Dr. Gaston prescribed occupational therapy ("OT") for her elbow. *Id*. L.J. saw Dr. Gaston again on July 23, 2015, when she reported some improvement through OT and use of a splint. *Id*. at 4. Dr. Gaston officially diagnosed carpal tunnel syndrome and cubital tunnel syndrome and administered an injection to provide relief. *Id*. L.J. completed 11 OT sessions between June 22, 2015, and July 30, 2015. *Id*. at 31, 41–61. She returned to Dr. Gaston on September 15, 2015, reporting resolution of the majority of her symptoms with the exception of some finger numbness. Ex. 8 at 2. He prescribed Mobic and ordered an MRI of Petitioner's right elbow, which revealed "distal triceps tendinopathy and potential punctuate interstitial partial thickness tearing present." Ex. 8 at 2; 28 at 20.

*Physical Therapy and Other Treatment Efforts*

L.J., who is herself a physical therapist, participated in physical therapy ("PT") sessions throughout her lengthy treatment, with sessions and several providers overlapping during the same periods or time.

L.J. began her first PT course at Owens PT on November 6, 2014, approximately three weeks after her vaccination. Ex. 25 at 2. At the initial evaluation, Petitioner was found to have "severe restriction of B B Scales, UT, Deltoid with reproduction of pt's sx's (N+T down RUE) on palpation of mid-deltoid." *Id*. On Physical therapist, Denise Owens, noted "limited cervical and R shldr AROM" with "R shldr flex 163 deg." *Id*. By December 4, 2014, L.J.'s active range of motion decreased to 149 degrees. Ex. 25 at 9. L.J. had 12 physical therapy sessions through January 1, 2015. *See* Ex. 25.

She returned to Owens PT from April 1, 2015, through September 28, 2015, completing another 15 sessions. Ex. 21 at 2–19. Upon returning, Petitioner reported "onset October 2014 post-flu shot to R arm . . . R shoulder pain and parethesias including temperature changes at hand, which persist." *Id*. at 2. At her final visit, L.J. had full right shoulder ROM, full cervical ROM, and had decreased the frequency, intensity, and duration of her symptoms. *Id*. at 19.

L.J. also received concurrent PT treatments at OrthoCarolina, starting on December 26, 2014. Ex. 8 at 38. She complained of "neck, shoulder, and right upper extremity radicular symptoms" that "began on or around 20 October 2014 following a flu vaccine administration." *Id*. The physical therapist found reduced range of motion in L.J.'s cervical spine and positive impingement signs in her right shoulder. *Id*. at 39. Physical therapist, Chris Dollar noted "positive

5

and diminished Hawkins-Kennedy test." *Id*. She had nine physical therapy sessions through January 26, 2015. *Id*. at 63–77. She returned to OrthoCarolina for an additional two sessions between August 6, 2015, and September 2, 2015. Ex. 8 at 28–30.

In addition, Petitioner received PT from other providers. She participated in 21 sessions of PT at the Novant health Rehabilitation Center between February 4, 2015, and May 7, 2015. Ex. 23 at 3–158. At her initial visit, she reported "diffuse arm/neck/face pain R that began last fall" *Id*. at 3. By March 2015, L.J. had improved ROM and an overall decrease in symptoms and was encouraged to return to her normal lifestyle. *Id*. at 67, 97. L.J. began PT at Roper PT on February 25, 2015, and completed 13 sessions through December 14, 2015. Ex. 22 at 2–27. At her final visit, L.J. reported her symptoms as 85% better. *Id*. at 27. And she completed 26 sessions at Kane Training between June 4, 2015, and October 6, 2016. Ex. 29 at 2ɣ. By November 2015, L.J. had returned to running without significant issues. *Id*. at 4. In total, L.J. participated in 100 physical therapy sessions between November 6, 2014, and December 14, 2015.

In addition to extensive PT, L.J. also sought care from an acupuncturist for her right arm pain, decreased sensation, TMJ, headaches and anxiety. *See* Ex. 24. She had 33 sessions of acupuncture between January 27, 2015, and June 23, 2016. *Id*. at 8–40. And L.J. received eight sessions of chiropractic treatment between February 18, 2015, and March 6, 2015. Ex. 19 at 2–16.

## III. Legal Standards for Vaccine Program Damages Components

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22–23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the

injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a Court of Federal Claims decision several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). The Court maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id*. at 589–90. Instead, the Court assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593–95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards—it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. While *Graves* does not compel a particular mechanism of calculating pain and suffering, it makes reasonable observations about the issue that are worthy of consideration herein.

### IV.   Appropriate Compensation in this Matter

#### A.   *Pain and Suffering*

In this case, awareness of the injury is not disputed. This leaves only the severity and duration of Petitioner's injury to be evaluated in calculating the pain and suffering component of damages. When performing this analysis, I review the record as a whole to include the medical records and affidavits filed and all assertions made by the parties in written documents.

Petitioner requests $110,000.00 in past pain and suffering. In support of this sum, Petitioner stresses the duration and severity of the pain she suffered, and the effect it had on her everyday activities. Mot. at 27. She details the difficulties she had sleeping, her significant weight loss, and the fact that she ultimately became depressed as a result of her injury. *Id*. Petitioner also maintains

7

that the acute nature of her injury, coupled with her difficulties in ascertaining its cause, further impacted her family life and overall health. *Id.*

As additional support, Petitioner cites to another Program decision involving SIRVA and the same pain and suffering award requested in this case. *Cooper v. Sec'y of Health & Hum. Servs.*, No. 16-1378V, 2018 WL 6288181 (Fed. Cl. Spec. Mstr. Nov. 7, 2018) (awarding $110,000.00 in pain and suffering for three years of injury and approximately 35 PT sessions). And she references two more recent SIRVA damages determinations (albeit involving somewhat lower awards). Mot. at 28–29; *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202 (Fed. Cl. Spec. Mstr. Mar. 31, 2021) (awarding $95,000.00 in actual pain and suffering); *Hein v. Sec'y of Health & Hum. Servs.*, No. 19-1943V, 2021 WL 4805232 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) (awarding $93,000.00 in actual pain and suffering). Petitioner argues that she is entitled to a larger award, however, both because her overall course was more severe, featuring no treatment gaps, and because she had three children to care for at the time of her injury. Mot. at 29.

In contrast, Respondent proposes the lesser sum of $67,500.00. Opp. at 1. He argues that Petitioner's SIRVA was relatively moderate in nature. *Id.* at 12–14. Moreover, the medical records establish that Petitioner's injury had significantly improved within five months of onset, she had regained full range of motion within nine months of treatment, and she had returned to her normal activities within fourteen months. *Id.* at 14. Although Petitioner emphasizes her extensive PT treatments, in addition to acupuncture and chiropractic treatments, as further evidence of the severity of her injury, Respondent maintains that some of the treatments were unrelated, as Petitioner concurrently suffered from a TMJ dislocation and carpal/cubital tunnel syndrome. *Id.* at 13; Ex. 24 at 1.

Further, in Respondent's view *Accetta* and *Hein* are not factually analogous to Petitioner's case (and thus reflect higher awards than appropriate). Opp. at 14. The *Accetta* petitioner's SIRVA-related symptoms persisted and fluctuated over a five-year period, justifying an award just under $100,000.00. In *Hein* (a decision I issued), the petitioner's injury lasted over 27 months, and involved three steroid injections. And Respondent reasons that *Cooper* is an outlier, given the more recent trend of pain and suffering awards in cases not involving surgery. Opp. at 14.

Respondent deems different cases to be better comparables. *See, e.g., Bartholomew v. Sec'y of Health & Hum. Servs.*, No. 18-1579V, 2020 WL 3639805 (Fed. Cl. Spec. Mstr. June 5, 2020) ($67,000.00 awarded in pain and suffering), and *Berberich v. Sec'y of Health & Hum. Servs.*, No. 20-10V, 2021 WL 4823551 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) ($60,000.00 awarded). The *Bartholomew* petitioner had 43 PT sessions, but by eight months post-vaccination was determined to have no functional limitations, and she rated her pain as ranging from one to four out of ten. *Bartholomew,* 2020 WL 3639805 at *3, 4. The *Berberich* petitioner received a steroid injection twelve days post-vaccination, attended two PT sessions, and was subsequently discharged nine months post-vaccination. *Berberich,* 2021 WL 4823551 at *7. In light of these determinations,

8

Respondent argues that $67,500.00 is fair. L.J.'s case is similar to *Bartholomew* in that both claimants showed a resolution of any functional limitations within eight to nine months. Opp. at 16. Respondent acknowledges that L.J. attended more PT sessions than in *Bartholomew*, but that fact must be counterbalanced against Petitioner's more complete recovery herein.

The overall record reveals that Petitioner exhibited relatively moderate to severe pain and limitation in movement during the ensuing two years of post-vaccination treatment. Petitioner's treatment consisted of 115 sessions of PT, 33 sessions of acupuncture, eight sessions of chiropractic treatment, an MRI of her shoulder, but no surgical intervention. However, the degree of treatment received in this case must be weighed against the fact that she never required surgical intervention. As I have repeatedly ruled (and while there are of course exceptions depending on the specific facts of a case), the fact that a SIRVA claimant does not require such intervention suggests a pain and suffering award of less than $100,000.00 is appropriate. *Wylie v. Sec'y of Health & Hum. Servs.*, No. 20-1314V, 2022 WL 17968929, at *6 (Fed. Cl. Spec. Mstr. Dec. 7, 2022).

Ultimately, Petitioner's case is similar to prior cases with below-median awards for past pain and suffering. Such petitioners tended to have moderate symptoms with good results from treatment—and more often than not, did not require surgery. The awards in these cases ranged from $60,000.00 to $90,000.00. I thus find Respondent's comparables to be a good starting point for fashioning an award. However, Petitioner's case is most like the facts found in a case neither party cited: *Kent v. Secretary of Health & Hum. Servs.*, No. 17-73V, 2019 WL 5579493, at *2 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00). There, the petitioner sought prompt but conservative medical attention largely consisting of physical therapy, and the primary MRI finding was one torn tendon, which was likely inflamed by the vaccination (similar to that of L.J.'s case).

While the petitioner in *Kent* attended fewer PT sessions, and the overall duration of the injury was shorter, it provides a reasonable guideline for a fair award herein. And I must take into account the fact (as my Ruling on Entitlement made clear) that Petitioner experienced a number of comorbid, unrelated symptoms that are distinguishable from her SIRVA, and for which she should not receive damages. Ruling on Entitlement at 18. Thus, Petitioner's comparables are simply too high under the circumstances.

Accordingly, and based on all of the foregoing, I award **$80,000.00** in actual pain and suffering in this case.

### B.   *Past Unreimbursed Expenses*

In her opening brief, Petitioner requested past unreimbursed expenses totaling $7,056.46. Petitioner maintains that in calculating her claim for damages, she limited her claim to only include

incurred expenses related to her SIRVA injury—not those related to any pre-existing or non-vaccine related injury. Reply at 3. Respondent in reaction has argued that, based on the medical records, Petitioner's SIRVA had essentially resolved by the end of 2015, but that Petitioner submitted incurred expenses for medical treatment sought in 2016 and 2017 for unrelated conditions. Opp. at 16. Thus, Respondent maintains that Petitioner should be awarded the lesser sum of $4,606.60 in past unreimbursed expenses (with no award for the $2,449.86 in expenses incurred in 2016 and 2017). *Id*. In response, Petitioner maintains that all but one of the submitted itemized documentation for incurred expenses from 2016 and 2017 were SIRVA-associated. Reply at 4.[5] The PT visits in particular addressed her ongoing SIRVA injury, "with a primary focus on building strength and returning to her pre-vaccination activity level without pain." *Id*. at 5; Exs. 29, 39. Accordingly, Petitioner has reduced her claim for past unreimbursed expenses to the lesser amount of $6,977.25.

After reviewing the submitted itemized documentation for Petitioner's claimed past unreimbursed expenses in 2016 and 2017, I find the record supports the revised sum proposed by Petitioner. Between 2016 and 2017, Petitioner underwent a total of twenty-nine PT sessions for the purpose of "address[ing] her ongoing right shoulder symptoms, with a primary focus on building strength and returning to her pre-vaccination activity level without pain." Reply at 5. While Respondent maintains that Petitioner's SIRVA had essentially resolved by the end of 2015, Petitioner notes at the conclusion of her last PT session in 2015 (December 17), her physical therapist reported that "[Patient] would benefit from continued therapy to improve cervical range of motion and right upper extremity function" Opp. at 16; Reply at 6; Ex. 29 at 3. She continued to attend PT sessions approximately once every three weeks over the course of 2016 and 2017. Reply at 6. Moreover, the PT records for 2016 and 2017 note treatment relating to Petitioner's right shoulder tightness and her continued treatment and effort in returning to her pre-vaccination activity level. *Id*. at 6–8.

## C. *Past Lost Wages*

Petitioner initially claimed lost wages in the total sum of $9,223.80. Mot. at 21–23. However, Respondent noted that in calculating lost earnings, Petitioner had not accounted for appropriate offsets for taxes. Opp. at 17. Respondent subsequently applied the appropriate offsets and maintains that Petitioner is entitled to an award of $5,681.50 in actual past lost earnings. *Id*. In her reply, Petitioner agreed with Respondent and amends her past lost wages claim to a total of $5,681.50. Opp. at 17; Reply at 2. That sum is therefore adopted in this damages decision.

---

[5] In her Reply, Petitioner notes that in her review of the PT records, one PT visit from 2017 does not refer to any treatment received relating to her SIRVA. Instead, the PT records for May 18, 2017, refer to irritation in Petitioner's right hip. Reply at 4; Ex. 39 at 4.

**CONCLUSION**

For all the reasons discussed above and based on consideration of the record as a whole, **I hereby award a lump sum of $92,658.75, in the form of a check payable to Petitioner, reflecting the following:**

- **$80,000.00, representing an award of actual pain and suffering;**

- **$6,977.25, representing past unreimbursed expenses; and**

- **$5,681.50, representing past lost wages.**

These amounts represent compensation for all damages that would be available under Section 15(a).

Absent a timely motion for review, the Clerk of Court is directed to enter judgment in accordance with this Decision.[6]

**IT IS SO ORDERED.**

s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.